Nos. 22-16903, 22-16904 (consolidated)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PERRIN AIKENS DAVIS; BRIAN K. LENTZ;
CYNTHIA D. QUINN; MATTHEW J. VICKERY,

*Plaintiffs-Appellees*,

v.

SARAH FELDMAN; HONDO JAN; ERIC ISAACSON,

*Objectors-Appellants*,

v.

META PLATFORMS, INC.,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Case No. 5:12-md-02314-EJD | The Honorable Edward J. Davila

## APPELLEE META PLATFORMS, INC.'S ANSWERING BRIEF

Christopher Chorba
Daniel R. Adler
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
CChorba@gibsondunn.com
DAdler@gibsondunn.com

Lauren R. Goldman
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
LGoldman@gibsondunn.com

Aaron Smith
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
(202) 955-8500
ASmith3@gibsondunn.com

# CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, Meta Platforms, Inc. discloses that it is a publicly traded company (NASDAQ: META) and that no parent corporation or publicly owned corporation owns 10% or more of its stock.

Dated: July 20, 2023                    /s/ *Lauren R. Goldman*
                                        Lauren R. Goldman

                                        *Counsel for Meta Platforms, Inc.*

i

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................... 1

STATEMENT OF JURISDICTION............................................ 5

STATEMENT OF THE ISSUE ................................................. 5

STATEMENT OF THE CASE ................................................... 5

    I.    Facebook users sue the company over cookies. ..................... 5

    II.    The parties negotiate a settlement. ...................................... 8

    III.    The parties' extensive settlement notices reach millions of people and provide easy-to-understand information about the settlement. .............................................. 10

    IV.    Class members overwhelmingly support the settlement, with only nine objections.................................. 11

    V.    The district court grants final approval of the settlement................................................................. 13

SUMMARY OF ARGUMENT .................................................. 16

STANDARD OF REVIEW....................................................... 20

ARGUMENT ........................................................................... 21

    I.    The district court did not abuse its discretion in approving a settlement that provided meaningful relief to the class. ............................................................. 21

    II.    The objectors' challenges to the settlement are meritless. ......................................................................... 25

        A.    The district court applied the correct legal standard. ...................................................... 26

i

B. The district court did not abuse its discretion in overruling objections to the settlement relief..............29

    1. Feldman and Jan invited the district court to use $900 million, not $1.24 trillion, as a benchmark. ........................................................31

    2. This Court has rejected Feldman and Jan's proposed approach to evaluating settlements...........................................................32

    3. A $1.2 trillion benchmark would be unreasonable and unconstitutional in any event. ...................................................................35

    4. The objectors' attempts to downplay $90 million and disregard meaningful injunctive relief are meritless...............................................38

C. The settlement's division of monetary relief is reasonable and not a basis for reversal. ......................42

D. The settlement notice satisfied due process. ...............45

E. The partial sealing of plaintiffs' complaint does not justify reversal. ......................................................51

CONCLUSION .......................................................................57

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*In re Apple Inc. Device Performance Litig.*,
  50 F.4th 769 (9th Cir. 2022) ........................................................ 26, 44

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
  222 F.3d 52 (2d Cir. 2000) ..................................................................... 54

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
  814 F.3d 132 (2d Cir. 2016) .................................................................. 53

*In re Bluetooth Headset Prods. Liab. Litig.*,
  654 F.3d 935 (9th Cir. 2011).......................................................... 17, 24

*Briseño v. Henderson*,
  998 F.3d 1014 (9th Cir. 2021)........................................................ 24, 25

*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020)........................................... 20, 21, 36, 40

*Chieftain Royalty Co. v. Enervest Energy Inst. Fund*,
  888 F.3d 455 (10th Cir. 2017)............................................................... 44

*Day v. Persels & Assocs., LLC*,
  729 F.3d 1309 (11th Cir. 2013).......................................................... 46

*Depuy Synthes Prods., Inc. v. Veterinary Orthopedic
  Implants, Inc.*,
  990 F.3d 1364 (Fed. Cir. 2021)............................................................ 53

*DIRECTV, Inc. v. Brown*,
  371 F.3d 814 (11th Cir. 2004)............................................................... 35

*Dish Network LLC v. Gonzalez*,
  2013 WL 2991040 (E.D. Cal. June 14, 2013)...................................... 35

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
  999 F.3d 1247 (11th Cir. 2021)............................................................ 44

i

*In re Facebook Biometric Info. Priv. Litig.*,
  522 F. Supp. 3d 617 (N.D. Cal. 2021)................................................. 39

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019)................................................. 39

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020).......................................................... 7, 40

*Ford v. Saul*,
  950 F.3d 1141 (9th Cir. 2020).............................................................. 46

*Fraley v. Batman*,
  638 F. App'x 594 (9th Cir. 2016) ........................................... 19, 38, 39

*Gold Strike Stamp Co. v. Christensen*,
  436 F.2d 791 (10th Cir. 1970)............................................................. 48

*Gunnells v. Healthplan Servs., Inc.*,
  348 F.3d 417 (4th Cir. 2003)............................................................... 54

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998)..................................... 17, 20, 21, 28, 40

*In re Hyundai & Kia Fuel Econ. Litig.*,
  926 F.3d 539 (9th Cir. 2019).............................................................. 47

*IDT Corp. v. eBay*,
  709 F.3d 1220 (8th Cir. 2013)............................................................. 52

*Johnson v. NPAS Sols., LLC*,
  975 F.3d 1244 (11th Cir. 2020)........................................................... 44

*Kim v. Allison*,
  8 F.4th 1170 (9th Cir. 2021) ............................................................... 23

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012)................................................... 33, 36, 47

*Linney v. Cellular Alaska P'ship*,
  151 F.3d 1234 (9th Cir. 1998)............................................................. 34

ii

*Loher v. Thomas*,
  825 F.3d 1103 (9th Cir. 2016).............................................................32

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000).......................................................13, 26

*Nixon v. Warner Commc'ns, Inc.*,
  435 U.S. 589 (1978)...................................................................52

*In re NVIDIA GPU Litig.*,
  539 F. App'x 822 (9th Cir. 2013) ...............................................46, 49

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982)......................................................39, 41

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015)................................................45, 50, 51

*In re Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010)........................................................32

*Perkins v. LinkedIn Corp.*,
  2016 WL 613255 (N.D. Cal. Feb. 16, 2016)........................................48

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999)......................................................49

*Philibotte v. Nisource Corp. Servs. Co.*,
  793 F.3d 159 (1st Cir. 2015) .......................................................52

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)...............................................................47, 48

*Reynolds v. Beneficial Nat'l Bank*,
  288 F.3d 277 (7th Cir. 2002)........................................................33

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009)............................2, 18, 19, 21, 30, 32, 33,
                                                      34, 42, 43, 44, 46, 47

iii

*Russell v. Kohl's Dep't Stores, Inc.*,
  755 F. App'x 605 (9th Cir. 2018) ........................................ 43

*Saucillo v. Peck*,
  25 F.4th 1118 (9th Cir. 2022) ............................................. 26

*Shane Group, Inc. v. Blue Cross Blue Shield*,
  825 F.3d 299 (6th Cir. 2016) ............................................... 54

*State Farm Mut. Auto Ins. v. Campbell*,
  538 U.S. 408 (2003) ............................................................ 37

*In re Suboxone (Buprenorphine Hydrochlorine and Naloxone)
  Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) ................................................ 54

*Surowitz v. Hilton Hotels Corp.*,
  383 U.S. 363 (1966) ............................................................ 54

*In re Valdez*,
  289 F. App'x 204 (9th Cir. 2008) ........................................ 46

*In re Volkswagen "Clean Diesel" Liab. Litig.*,
  914 F.3d 623 (9th Cir. 2019) .............................................. 48

*Wakefield v. ViSalus, Inc.*,
  51 F.4th 1109 (9th Cir. 2022) ........................................ 3, 37

## Statutes

15 U.S.C. § 15(a) ................................................................... 34

18 U.S.C. § 2520(c)(2) .......................................................... 35

## Other Authorities

FJC, *Judges' Class Action Notice and Claims Process
  Checklist and Plain Language Guide* (2010),
  tinyurl.com/59rmjfhn .......................................................... 49

FJC, *Securities Class Action Certification and Settlement:
  Full Notice* (2005), tinyurl.com/yw56rphv ......................... 48

Form 10-K (Feb. 1, 2023), https://tinyurl.com/49363p6y..........................37

**Rules**

Fed. R. Civ. P. 23 .......................................................................50

Fed. R. Civ. P. 23(c)(2)(B)..........................................................48

Fed. R. Civ. P. 23(e)(1)(B)..........................................................48

Fed. R. Civ. P. 23(e)(2)........................................................16, 21

## INTRODUCTION

To settle this data-privacy case, Meta agreed to pay $90 million and promised to delete the data plaintiffs say it should not have collected. The settlement and the district court's order approving it comply with this Court's most recent decisions on class-action settlements. The district court applied the standard, multifactor test to assess whether the settlement is "fair, reasonable, and adequate" under Rule 23, and reasonably concluded it is. After a decade of litigation, the case was still at the motion-to-dismiss stage, and plaintiffs' novel theories of liability and damages faced an uncertain and uphill battle that would have taken a great deal of time and money to fight. So the parties reached a deal—one that delivered meaningful monetary and injunctive relief. And nothing in that deal favors the interests of Meta or plaintiffs' counsel over the interests of the class.

Because this proposed settlement passes all the tests imposed by existing settlement-approval law, the objectors in these consolidated appeals (Sarah Feldman and Hondo Jan in one, Eric Isaacson in the other) have asked the Court to change that law. If they get their way, however, it will be difficult or impossible for cases like this one to be

1

settled—and for no good reason. The Court should reject their theories—in some cases, it already *has* rejected them—and affirm the order approving the settlement.

The objectors' principal grievance is with the amount of the settlement. They say the $90 million plaintiffs secured from Meta compares poorly with their preferred benchmark—$1.24 *trillion*. The objectors assert that the only way to look at this case is in terms of the *maximum* theoretical statutory penalties that a court could award—$10,000 per class member, multiplied by some 124 million class members.

There are many problems with that theory. First of all, the objectors waived it by inviting the district court to use a $900 million benchmark, not a trillion-plus benchmark. The theory is meritless in any event. This Court has already rejected the notion that district courts must award some fraction of the maximum theoretical damages. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). Instead, district judges deciding whether to approve settlements are required to exercise their discretion and to evaluate whether proposed settlements are fair and reasonable in light of all the relevant facts—for example, the

fact that the relevant statutory damages are discretionary and that plaintiffs faced significant obstacles on the road to recovery at this early stage of the case. Beyond that, plaintiffs' benchmark is irrelevant because any award close to that level would violate due process. This Court has recognized that statutory-damages awards are "subject to constitutional due process limitations," *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1121 (9th Cir. 2022), and the objectors themselves concede, as they must, that a trillion-dollar award would exceed those limits. They never explain why a purely theoretical and plainly unconstitutional award could nevertheless serve as an appropriate yardstick against which to measure this—or any—settlement.

Nor do any of the objector-specific arguments provide a basis for overturning the approval order. Isaacson asks the Court to chart a new course on the propriety of service awards. But there is no authority for Isaacson's challenge to the small payment each plaintiff is set to receive here (either $3,000 or $5,000, and $29,000 altogether). Isaacson seems to think *all* service awards are inappropriate, but this Court routinely approves them as modest compensation for the time spent prosecuting a case—in this one, over a decade. And he never explains why the Court

should upend a $90 million settlement over awards constituting 0.03% of the total fund.

Feldman and Jan ask the Court to break new ground on class notice, arguing that a notice is per se inadequate if it does not precisely list all the claims at issue (even if, as in this case, it provides a link to many documents that do just that). This argument is waived—Feldman and Jan did not make it in the district court—and it is wrong. The purpose of notice is to explain to class members, in plain English, the nature of the parties' dispute and the mechanics and consequences of the settlement. Requiring notices to be longer and more technical would not serve that purpose.

Finally, Isaacson has yet another theory to upend the law of class settlements: If key documents in the case, including a complaint, are even partially sealed, then plaintiffs and the absent class members could not possibly have enough information to know whether to accept a proposed settlement. That theory makes no sense. Narrowly tailored sealing is often appropriate, as it was here, to protect sensitive business information. A defendant should not have to sacrifice its legitimate interest in confidentiality in order to settle a class action. And Isaacson

never explains how the minimal sealing in this case has in any way frustrated the ability of plaintiffs and the absent class members to understand the nature of the parties' underlying dispute, the strength of plaintiffs' case, or whether to participate in or opt out of the settlement.

The settlement resolving this lawsuit is fair, and the district court did not abuse its discretion in approving it. The Court should affirm the approval order.

## STATEMENT OF JURISDICTION

Meta agrees with the objectors' statements of jurisdiction.

## STATEMENT OF THE ISSUE

Did the district court abuse its discretion in approving a settlement that calls for Meta to pay $90 million and delete the data that gave rise to this lawsuit?

## STATEMENT OF THE CASE

### I. Facebook users sue the company over cookies.

In 2010, Facebook launched a "Like" button plug-in that other websites could install. 3-IER-319.[1] When a Facebook subscriber visited

---

[1] "IER" refers to Isaacson's excerpts of record. "FER" refers to Feldman and Jan's excerpts of record. "SER" refers to Facebook's supplemental excerpts of record.

a website with a Facebook plug-in (such as the "Like" button), the user's browser would redirect data about the user to Facebook. 3-IER-319. "Cookies"—small text files stored on a user's device—stored the data, and for a period of 16 months, these cookies allegedly continued to capture information after a user logged out of Facebook. 3-IER-319. Facebook was not "trying to collect" this data; there was "a bug" in its systems that resulted in the "inadvertent" collection of it. 4-IER-652. After the bug was discovered, Facebook "immediately" ceased the practice, announced it publicly, and "did not use" the data. 4-IER-652.

In September 2011, a Facebook user brought a putative class action challenging the collection of data about the browsing activities of logged-out users over this 16-month period. *Davis v. Facebook, Inc.*, No. 11-cv-4834 (N.D. Cal.). After other similar lawsuits were filed, the Judicial Panel on Multidistrict Litigation centralized all of them into the multidistrict litigation proceedings below. *See* 2-IER-199; 4-IER-750.

After the cases were consolidated, plaintiffs—four Facebook users serving as putative class representatives—filed a first amended complaint. 4-IER-752. The district court dismissed that complaint with leave to amend, 4-IER-757, and plaintiffs filed a second amended

6

complaint asserting eleven claims, including for violation of the Wiretap Act, breach of contract, and breach of the implied covenant of good faith and fair dealing, 3-IER-511–28; *see In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 597 (9th Cir. 2020) (summarizing claims). The district court then dismissed the second amended complaint, with leave to amend only two claims (the breach-of-contract and good-faith-and-fair-dealing claims). 4-IER-764; *see Facebook*, 956 F.3d at 597. Plaintiffs filed a third amended complaint asserting only those two claims, *see* 3-IER-316–48, and the district court dismissed that one, too, 4-IER-766.

Plaintiffs appealed, and this Court affirmed in part, reversed in part, and remanded. *Facebook*, 956 F.3d at 611. It concluded that plaintiffs had not adequately alleged their breach-of-contract claim, good-faith-and-fair-dealing claim, and one other statutory claim. *Id.* at 611. It also determined that eight claims, including a Wiretap Act claim, were improperly dismissed, *id.* at 599, 601, while declining to "opine whether the Plaintiffs adequately pleaded the other requisite elements" of some of the claims, including the Wiretap Act claim, *id.* at 608. Facebook then filed a cert petition, which was denied. 141 S. Ct. 1684 (2021) (mem.). Because this Court did not reach Facebook's additional arguments for the

7

dismissal of some claims, Facebook was prepared to file another motion to dismiss on remand.

## II.  The parties negotiate a settlement.

Although Facebook remained confident that it would prevail on plaintiffs' remaining claims, the parties entered settlement negotiations soon after this Court's remand.  *See* 4-IER-770.  (The settlement negotiations also covered similar claims brought by three plaintiffs in state court.  *See* FER-5.)  After a lengthy mediation, the parties reached agreement and filed a motion for preliminary approval of their settlement.  4-IER-580; 4-IER-770–71; SER-96.

The settlement provided two significant forms of relief—injunctive and monetary—in exchange for a release of claims.  *See* 2-IER-157–58 (§ 1.44).  *First*, Facebook agreed to search for, collect, sequester, and delete "all cookie data" that plaintiffs alleged were received or collected improperly between April 22, 2010, and September 26, 2011.  2-IER-167 (§ 5.1).  The parties spent six months negotiating the contours of this injunction.  SER-96; *see* 4-IER-584; 4-IER-654.  The injunctive relief applies class-wide and thus "benefits everybody," including class

members who did not file a claim for monetary damages. 4-IER-586; *see also* 4-IER-653–54 (discussing value of injunctive relief).

*Second*, Facebook agreed to pay $90 million into a settlement fund. 2-IER-164 (§ 4.1). That $90 million fund was then the seventh-largest amount in a privacy class action settlement. SER-101. Class members who submitted approved claims and did not opt out were entitled to receive an equal cash payment from the settlement fund. 2-IER-165 (§ 4.3). The fund is non-reversionary, so any amount remaining after the initial settlement payments will not be returned to Facebook or redirected to plaintiffs' counsel. 2-IER-167 (§ 4.8).

Plaintiffs' counsel also sought $26 million in attorneys' fees (29% of the settlement fund), *see* FER-20, and service awards of either $3,000 or $5,000 for each of the seven plaintiffs, *see* FER-4.

After briefing and a hearing, the district court granted preliminary approval of the settlement in March 2022. 1-IER-33; *see also* 4-IER-620–22.

9

## III. The parties' extensive settlement notices reach millions of people and provide easy-to-understand information about the settlement.

The parties executed a three-pronged notice plan. First, the court-appointed settlement administrator delivered about 86 million emails to class members. FER-7, FER-10; 2-IER-205. Second, the settlement administrator ran a multi-week online media campaign that created about 377 million impressions and reached about 80 percent of all adults in the country. FER-7, FER-10; 2-IER-205, 2-IER-208–13. Third, the settlement administrator established a settlement website (www. fbinternettrackingsettlement.com) for class members to learn more about the settlement and, if desired, to contact plaintiffs' counsel with any questions. FER-7; *see* 2-IER-168–69; 2-IER-213–14.

The notice provided relevant information about the case. *See* 2-IER-238. Right at the top, the notice identified who should pay attention: any "Facebook User in the United States who visited non-Facebook websites that displayed the Facebook Like button" between April 2010 and September 2011. FER-144. The notice also explained, in plain English, what claims were involved in the case: The "lawsuit

10

alleges that [Facebook] improperly obtained and collected data from Facebook Users" covered by the settlement.  FER-146.

The notice further directed interested recipients to the settlement website as a source of more information.  FER-144, FER-146.  The website, in turn, included copies of multiple relevant filings from the case.  For example, the website posted the second amended complaint (which asserted the Wiretap Act claim, 3-IER-511–13), the third amended complaint (which preserved the Wiretap Act claim for appeal, 3-IER-321), and the motion for preliminary approval, which further discussed the Wiretap Act.  FER-127; SER-122, SER-124 & n.3.

The complaints posted to the settlement website were the as-filed, publicly available versions, so they contained limited redactions authorized by the district court in an order granting a motion to seal some of Facebook's sensitive business information.  SER-150; *accord* 1-IER-34. The second amended complaint, for example, is 57 pages long and contains redactions to portions of 13 pages.  3-IER-469–530.

## IV.  Class members overwhelmingly support the settlement, with only nine objections.

The vast majority of class members who responded to the notice approved the settlement.  About 1.5 million submitted claims were

11

deemed valid by the settlement administrator.  FER-8; 4-IER-640.  Only 1,374 people opted out of the settlement class (0.06% of the responses to the settlement administrator).  FER-8–9; 4-IER-648.  And only nine people (or 0.0004%) objected to the settlement, FER-11, including the three objectors in these appeals, *see* 2-IER-62 (Isaacson objections); SER-3 (Feldman and Jan objections).

Feldman and Jan argued that the settlement relief was inadequate. They acknowledged that a "trillion dollar recovery"—the $10,000 maximum statutory damages under the Wiretap Act multiplied by the 124 million putative class members—would be "unlikely to survive appellate challenge" because a judgment in that amount "would violate due process," but they contended that "if Plaintiffs prevailed at trial on their wiretap claims, they could have expected an enforceable recovery of up to $900 million."  SER-5–6.  The $90 million settlement, they claimed, represented an "indefensible" "90% discount."  SER-6.

Feldman and Jan also argued that the manner in which notice was sent to class members was inadequate because the "notice program failed to use Facebook Messenger."  SER-16.  Feldman and Jan did not raise concerns with the contents of the notice itself.  *See generally* SER-16–17.

12

Isaacson echoed Feldman and Jan's objections to the settlement relief, 2-IER-71, and raised several additional objections. He argued that the "incentive awards" for plaintiffs were unwarranted, 2-IER-72–73; 4-IER-694, and he challenged the attorneys' fees as excessive, 2-IER-75–79. He also contended that providing class members with access to redacted complaints violated their due-process rights, as well as First Amendment and common-law rights of access. 2-IER-68; 4-IER-691.

## V. The district court grants final approval of the settlement.

After the district court held a lengthy fairness hearing and discussed the settlement with counsel for plaintiffs, counsel for Facebook (which by then had changed its name to Meta), and counsel for the three objectors in this appeal, *see* FER-28–143, it granted final approval of the settlement in a written order, FER-3–27.

Recognizing that settlements "before formal class certification . . . 'require a higher standard of fairness,'" FER-8 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)), the district court carefully analyzed the necessary factors and concluded that the settlement was fair and reasonable, FER-9 (citing "the *Churchill* factors"). The decade-long litigation was "hard-fought," and continuing

13

to fight through a final judgment would take "many more years." FER-9. Although plaintiffs had secured a threshold victory at the pleadings stage, there was "substantial risk and cost in continued litigation," in part because plaintiffs' recovery depended on "novel and uncertain damage theories." FER-9; *see also* FER-17 (noting that plaintiffs "analyzed maximum recoveries" and weighed them "against the barriers to achieving such a result"). In light of those risks, the parties had "negotiated at arms-length" to resolve this case through mediation. FER-9. And the "reaction of the class" to that settlement was generally "positive," as there were very few opt-outs or objectors. FER-11.

The district court carefully addressed all of the objections, including those raised by Feldman, Jan, and Isaacson. After recognizing that $1.2 trillion in statutory damages was theoretically recoverable, the district court noted that even "Feldman and Jan acknowledge that a trillion-dollar recovery is unlikely" and that a more realistic measure of maximum damages was "closer to $900 million." FER-15. Given that upper limit of potential recovery and the full "circumstances" of the case, a $90 million settlement fund was by no means "unfair." FER-16; *see also* 4-IER-732–33 (noting at fairness hearing that "$90 million is a lot of

14

money"). The meaningful injunctive relief, which "ensure[d] that" class members' relevant "data would be completely expunged," bolstered that conclusion. FER-18; *see also* 4-IER-733–34 (describing the injunctive relief as a "game changer for the industry" because it set precedent for "destroy[ing]" data under settlement agreement).

The order also approved service awards of $3,000 to $5,000 for each plaintiff. Those awards recognized the time and effort plaintiffs put into representing the "data privacy interests of more than 124 million others for over a ten year period." FER-24–25. The district court also explained that the service awards did not treat unnamed class members inequitably, notwithstanding Isaacson's objection, because the aggregate $29,000 awarded to the seven plaintiffs was a "very small fraction" of the settlement fund. FER-25.

The court then granted plaintiffs' counsel's request for attorneys' fees. Acknowledging Isaacson's objections, the court explained that awarding attorneys' fees equal to 29% of the settlement fund was reasonable because, among other things, plaintiffs' partial win in their appeal to this Court had created "a change in the law." FER-23.

15

Turning to the notice plan, the district court rejected Feldman and Jan's objection that the settlement administrator should have provided notice "via Facebook Messenger rather than through email." FER-16. The notice plan had been "very successful" without the use of Facebook Messenger—the combination of email notice, online publications, and a settlement website had reached "99% of Class Members directly." FER-16; *see also* FER-10 (describing notice procedures).

Finally, the district court noted Isaacson's objection to the partially sealed complaints, but explained that the court had already resolved the sealing question in previous orders and was not going to revisit them. FER-16–17; *see* SER-150 (ordering partial sealing of second amended complaint); 1-IER-34 (ordering partial sealing of third amended complaint); FER-99 (plaintiffs' counsel describing litigation).

The district court issued its order granting final settlement approval on November 10, 2022. FER-27. The objectors timely appealed. FER-153; 4-IER-744.

## SUMMARY OF ARGUMENT

**I.** The district court here had to decide whether the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Applying

16

this Court's multifactor test from *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), the district court approved a proposed payment of $90 million and a binding promise to delete the data that gave rise to this suit. That decision was reasonable. After a decade of litigation, the case was still at the motion-to-dismiss stage. Plaintiffs were advancing novel theories, they faced a long and difficult road to trial, Facebook had strong arguments against certification of a litigation class, plaintiffs might not have won any relief for themselves and the absent class members, and they secured meaningful monetary and injunctive relief in the settlement. And this case exhibited none of the "warning signs" that have derailed other settlements on appeal. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). The settlement agreement forbids reversion; any money that goes unclaimed or unawarded to plaintiffs' lawyers will go to class members, not back to Meta. There is no clear-sailing agreement; Meta reserved the right to oppose any motion for attorneys' fees. And the class, not plaintiffs' lawyers, will receive the lion's share of the settlement.

17

**II.** The objectors challenge the district court's approval order in various ways. The district court did not abuse its discretion in overruling them.

**A.** The district court applied the correct legal standard to evaluate the settlement. Contrary to the objectors' assertions, the district court quoted and followed this Court's holding that pre-certification settlements "'require a higher standard of fairness,'" FER-8, walked methodically through the *Hanlon* factors, FER-9, and received briefing and further argument on the strength of the plaintiffs' claims, SER-77–79.

**B.** Feldman and Jan assert that the district court should not have approved a settlement any smaller than $12 billion—1% of the class's $1.2 trillion hypothetical maximum statutory damages under the Wiretap Act. But they waived that argument by taking a different position below. The argument is meritless in any event, for several independent reasons. First, this Court has already rejected invitations to prescribe mathematical formulas for evaluating settlements and to use theoretical maximum recoveries as benchmarks. *Rodriguez v. W. Publ'g Corp.,* 563 F.3d 948, 965 (9th Cir. 2009). Second, the notion of a $1.2

18

trillion award is too far-fetched—indeed, it would be unconstitutional—to serve as a viable yardstick to measure the settlement's fairness. *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016). Finally, notwithstanding the objectors' attempt to downplay $90 million and minimize Meta's promise to delete the data at issue in this litigation, the settlement relief was substantial and meaningful.

**C.** Regardless of whether the Court approves the small service awards for plaintiffs or the attorneys' fees for their lawyers, Meta submits that the Court should affirm the district court's settlement approval. *Rodriguez*, 563 F.3d at 968. But Isaacson has given the Court no good reason to vacate the service awards in any event.

**D.** Feldman and Jan claim the settlement notice was inadequate because it failed to state expressly that plaintiffs brought Wiretap Act claims. They did not present this argument to the district court, and thus forfeited it. But again, the argument is meritless: The settlement notice described in plain English that the case "alleges that [Facebook] improperly obtained and collected data," FER-146, and linked to a website with filings discussing the Wiretap Act for class members interested in those details. That is sufficient notice.

19

**E.** Isaacson suggests that class representatives and absent class members can never evaluate the propriety of a settlement when key documents in the case, such as a complaint, are even partially sealed. But he cites no cases standing for that proposition, which would make settlement impossible in any class action involving confidential information requiring narrowly tailored redactions. Isaacson also never explains what more information the absent class members would have needed to know to evaluate their claims. The wealth of public information provided in the class notice and linked website is more than enough to guide any class member's decision about the settlement.

## STANDARD OF REVIEW

Review of a district court's decision to approve a class action settlement is "extremely limited." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1121 (9th Cir. 2020). This Court has "repeatedly stated that the decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is 'exposed to the litigants, and their strategies, positions and proof.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

20

"Parties seeking to overturn the settlement approval must make a 'strong showing' that the district court clearly abused its discretion." *Campbell*, 951 F.3d at 1121. Under that standard, a reviewing court "'will affirm if the district judge applies the proper legal standard and his or her findings of fact are not clearly erroneous.'" *Rodriguez,* 563 F.3d at 963.

## ARGUMENT

## I.     The district court did not abuse its discretion in approving a settlement that provided meaningful relief to the class.

Because class settlements resolve the potential claims of absent class members, district courts must ensure that they are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The court here fulfilled that duty, citing and closely following all the relevant decisions on class-settlement approval along the way.

The district court began by laying out this Court's multifactor test, set out in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998), for determining whether a settlement is fair. FER-8. And it correctly decided that all the relevant factors favored the proposed settlement. For example:

- *Risk, expense, complexity, and likely duration of further litigation*: The case was "hard-fought," and it took "almost eleven years" to resolve the first round of motions to dismiss. FER-9. There was no reason to expect a quick resolution absent settlement: Ahead of plaintiffs lay "substantial risk and cost in continued litigation," including yet another motion to dismiss, plus "discovery, litigation class certification, summary judgment, trial, and appeals." FER-9.

- *Strength of plaintiffs' case*: Although plaintiffs persuaded this Court that the district court had erred in dismissing their entire complaint, they nevertheless were pressing "novel and uncertain damage theories" that ultimately could have yielded little or nothing for themselves and the absent class members. FER-9.

- *Amount offered in settlement*: Meta agreed to pay $90 million— "the seventh largest monetary settlement of its kind for data privacy cases at the time of settlement." FER-5, FER-9. The settlement also called for Meta to "sequester and delete all data that was wrongfully collected during the Class Period." FER-6. That injunctive relief is necessarily meaningful and valuable;

22

the entire lawsuit was founded on plaintiffs' claim that Meta's receipt of their data violated the law.

- *Reaction of the class to the proposed settlement*:  The class has 124 million members.  FER-13.  More than 1.5 million submitted valid claims.  FER-11.  Only nine objected, and only about a thousand opted out.  FER-11.

As the district court noted, 1-IER-7, the "'consideration of these . . . factors alone is not enough" for a precertification settlement "to survive appellate review,'" because "Rule 23(e)(2) also requires the court to consider 'the terms of any proposed award of attorney's fees' and scrutinize the settlement for evidence of collusion or conflicts of interest before approving the settlement as fair." *Kim v. Allison*, 8 F.4th 1170, 1179 (9th Cir. 2021).  The court decided that the fee award was reasonable in light of the "exceptional result" achieved by plaintiffs' counsel in winning a favorable decision from this Court and securing significant monetary and injunctive relief.  FER-21.  And there is no evidence of "collusion" between plaintiffs' counsel and Meta against the class to further their own interests.  FER-10; 4-IER-712.

23

In evaluating whether there may have been collusion to sell out the class members, this Court looks for three "warning signs": "reversio[n]" (any unclaimed settlement funds or unawarded fees go back to the settling defendant); a "clear sailing agreement" (the settling defendant agrees not to oppose the plaintiffs' request for fees and costs); and a "disproportionate distribution of the settlement" to the plaintiffs' lawyers. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

None of those warning signs appears in this settlement. The agreement "provides that no amount will revert" to Meta, and any unclaimed funds will go to other class members. FER-6–7; 2-IER-158, 2-IER-166–67. There is also no clear-sailing agreement; the settlement instead gave Meta the right to object to any fee request "for any reason." 2-IER-181; 4-IER-586. And the class received more than two-thirds of the $90 million fund, plus the deletion of the data whose collection gave rise to the suit in the first place. FER-6. That recovery makes this case quite unlike the many in which the plaintiffs' lawyers proposed making off with nearly the entire monetary value of the settlement. In *Briseño v. Henderson*, 998 F.3d 1014 (9th Cir. 2021), for example, this Court

24

reversed a settlement-approval order in part because the plaintiffs' lawyers would "receive seven times more money than the class members" and because the injunctive relief—a promise not to use a label that the defendant had already abandoned years before—was "worthless." *Id.* at 1018, 1020, 1028.

Because the settlement satisfies this Court's test for fairness, reasonableness, and adequacy, and because there is no reason to think it was the product of a collusive effort between Meta and plaintiffs' counsel to divert settlement funds away from class members, the district court did not abuse its discretion in approving the settlement.

## II. The objectors' challenges to the settlement are meritless.

Because this settlement meets all the requirements for approval and has none of the flaws that required reversal in other cases, the objectors ask this Court to impose a series of new and unreasonable standards for settlement approval. Objectors: (1) claim the district court order that cited all the right cases and performed the right analysis nevertheless gave the settlement insufficient scrutiny; (2) argue that settlements must be weighed against unattainable and unconstitutional monetary penalties; (3) protest that plaintiffs should not have received

even small awards for their service; (4) assert that class notice is per se inadequate if it does not describe the relevant statute by name; and (5) contend that class actions can never be settled if some filings were partially sealed. All of these arguments are meritless.

### A. The district court applied the correct legal standard.

The objectors assert that the district court applied the wrong legal standard to evaluate the settlement in three ways.

*First*, Isaacson argues (at 63–64) that the district court improperly applied a "strong presumption of fairness" to the entire settlement, but that argument is based on a fundamental misreading of the district court's order. The court followed this Court's mandates that a pre-class certification settlement is not "presumptively" reasonable, and it must undergo "heightened scrutiny." *Saucillo v. Peck*, 25 F.4th 1118, 1130–31 (9th Cir. 2022); *accord In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 782–83 (9th Cir. 2022). Consistent with *Saucillo* and *Apple*, and citing other precedent from this Court, the district court's final approval order stated: "Settlements that occur before formal class certification also 'require a higher standard of fairness.'" FER-8 (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000)). That sentence

was no accident. At the preliminary approval hearing, the parties recognized that a "heightened level of scrutiny" applied and that there was "no presumption of fairness." 4-IER-588, 4-IER-597–98. And because the district court issued the decision in *Apple* that was reversed on this very ground, it was particularly aware of this potential objection.

Perhaps recognizing this, Isaacson is not really attacking the district court's scrutiny of the entire settlement, but instead quibbling with a single line in the court's order. *See* Isaacson Br. 63. The district court reasoned that "very few" people objected to the proposed settlement, and that the "absence of a large number of objections" raised a "strong presumption that the terms" were favorable. FER-11. In context, the district court was simply explaining that the miniscule number of objectors raised a strong presumption that *one* of the *Hanlon* factors—the "reaction of the class," FER-11—favored settlement. Nothing in *Saucillo* or *Apple* prohibits that reasoning.

*Second*, Isaacson argues that the district court's final approval order was "based, first and foremost," on a *preliminary* approval order that did not analyze the *Hanlon* factors. Isaacson Br. 62. Isaacson's assertion is incorrect and beside the point. The district court held a

27

three-hour final approval hearing, heard from all parties and the objectors, and "read their pleadings." FER-133. The final approval order, in turn, unquestionably and thoroughly analyzed the *Hanlon* factors, including: the "substantial risk" of further litigation given "novel and uncertain damage theories"; the likelihood of "obtaining class certification"; the amount offered in settlement; the "discovery" and "motion practice" already completed; and the "reaction" of class members. FER-9, FER-11; *see Hanlon*, 150 F.3d at 1026 (listing factors). Nowhere did the final approval order—the only order that matters—suggest that the court was forgoing the required *Hanlon* analysis in favor of rote reliance on its preliminary approval order, as Isaacson suggests.

*Third*, Feldman and Jan argue that the district court was "prevented" from "discharging its duty" to evaluate the strengths and weaknesses of the case because plaintiffs "concede[d]" they "omitt[ed]" that discussion from their motion for final approval. Feldman Br. 22. Not so. Plaintiffs "cut out" "40 pages" from the motion because of page limits, *id.* (quoting FER-55), but the motion still included three pages (out of 25) assessing the strengths and weaknesses of the case, SER-77–79. At the approval hearing, plaintiffs further discussed the strengths and

28

weaknesses of their case, acknowledging the "many hurdles" they would need to clear to emerge victorious on their claims. FER-55. The district court—which had previously ruled on three separate motions to dismiss, and thus was familiar with both parties' legal arguments—in turn accounted for plaintiffs' belief in the "strength of their case" while acknowledging the "risk" that plaintiffs would not win. FER-9.

The objectors' suggestions that the district court applied the wrong legal standard thus cannot be squared with the record, including a final approval order that thoroughly and thoughtfully analyzed and accounted for every relevant factor set forth in this Court's decisions.

## B. The district court did not abuse its discretion in overruling objections to the settlement relief.

The district judge—who "lived the lawsuit" for more than a decade, FER-130—did not abuse his discretion in approving a settlement that encompassed both (1) one of the largest data-privacy settlements in history and (2) the defendant's deletion of all user data at issue.

The objectors primarily disagree with the district court's evaluation of one *Hanlon* factor: the amount of the settlement. Feldman Br. 11–29; Isaacson Br. 76–77. The district court reasonably concluded that $90 million—a "significant amount of money," by any definition—was fair.

29

FER-133. That number was the product of a hard-fought negotiation, and it provided plaintiffs with a meaningful recovery: The maximum monetary damages award that plaintiffs could possibly obtain in litigation—if they overcame all of the hurdles between the pleadings stage of a novel lawsuit and a final judgment on behalf of a nationwide class—was about $900 million. FER-15–16. As a matter of law, a settlement for "approximately ten percent of the class's estimate of its own" maximum damages is "fair and reasonable no matter how you slice it." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009).

Nevertheless, the objectors say $90 million was not enough. Feldman Br. 14–29; Isaacson Br. 76–77. In Feldman and Jan's view, the district court should have calculated the maximum hypothetical damages—$10,000 in Wiretap Act statutory damages multiplied by 124 million putative class members, equaling $1.24 trillion. Feldman Br. 14. Then, the district court should have crunched the numbers to "quantify the net expected value" of the litigation—$1.24 trillion multiplied by a 1 percent chance of success, equaling $12.4 billion. Feldman Br. 23–24. Because $90 million does not measure up to $12.4 billion, the objectors say, the district court should have rejected the settlement. Isaacson

further argues that the Court should disregard the injunctive relief because it purportedly provides no "significant benefit" to the class. Isaacson Br. 75–76.

The district court did not abuse its discretion for four reasons. *First*, Feldman and Jan invited the purported error and thus waived their challenge. *Second*, this Court has already rejected Feldman and Jan's pure-math approach to deciding the merits of settlement approvals. *Third*, it would have been improper to use as a benchmark a $1.2 trillion award that is both hypothetical and unconstitutional. *Fourth*, despite the objectors' attempts to downplay the settlement's fairness by comparing it to larger settlements and painting the injunctive relief as meaningless, $90 million and a commitment to delete the data at issue amount to substantial and valuable relief.

### 1. Feldman and Jan invited the district court to use $900 million, not $1.24 trillion, as a benchmark.

Feldman and Jan fault the district court for "assuming" plaintiffs would be limited to a "post-trial judgment" of $900 million and using that figure as a benchmark to evaluate the settlement award. Feldman Br. 14–15. But Feldman and Jan invited the very reasoning they now criticize. In their objections to the proposed settlement, Feldman and

31

Jan conceded that a "trillion dollar recovery was unlikely to survive appellate challenge" because it "would violate due process," so "if Plaintiffs prevailed at trial on their wiretap claims, they could have expected an enforceable recovery of *up to $900 million*." SER-5–6 (emphasis added). Feldman and Jan's "affirmative invitation" to use $900 million as a reasonable benchmark "constitute[s] waiver." *Loher v. Thomas*, 825 F.3d 1103, 1121 (9th Cir. 2016); *accord, e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 386 (9th Cir. 2010) (parties cannot "invite the district court to err and then complain of that very error").

Feldman and Jan's actual complaint in the district court was that the "90% discount on" the $900 million figure was "indefensible." SER-6. But a settlement award representing "ten percent" of a reasonable potential recovery is fair. *Rodriguez*, 563 F.3d at 965. Feldman and Jan no longer argue otherwise.

### 2. This Court has rejected Feldman and Jan's proposed approach to evaluating settlements.

The crux of Feldman and Jan's argument is that settlement approval decisions should be a mechanical math problem. As "explained by the Seventh Circuit," Feldman and Jan argue, the district court should have "'quantified the net expected value of continued litigation'" and

32

multiplied that by the probability of success. Feldman Br. 23 (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002)). Because the maximum potential recovery here was purportedly $1.2 trillion, the $90 million settlement must be too low.

But this Court was "not persuaded" by earlier, identical attempts to replace district courts' judgment with a calculator: "our approach, and the factors we identify, are somewhat different" than those of "the Seventh Circuit." *Rodriguez*, 563 F.3d at 965 (citing *Reynolds*, 288 F.3d 277). This Court does *not* ask district courts to "quantif[y] the expected value of fully litigating the matter." *Id.*; *see, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012) ("reject[ing]" objectors' assertion that district courts must compare the "specific monetary value" of statutory claims to settlement award). Rather, this Court puts a "good deal of stock in the product of an arms-length" negotiation, and has "never" done what Feldman and Jan ask this Court to do now—"prescrib[e] a particular formula by which" a settlement "must be tested." *Rodriguez*, 563 F.3d at 965.

Nor must district courts calculate the "maximum potential recovery" to analyze a settlement's reasonableness, Feldman Br. 22, as

settlement approvals in the antitrust context illustrate. In general, "treble damages" are an "automatic component of the recovery of antitrust damages." *Rodriguez*, 563 F.3d at 964 (emphasis omitted) (citing 15 U.S.C. § 15(a)). But "courts do not traditionally factor treble damages into the calculus for determining a reasonable settlement value," and it is not "legal error" for a court to "consider only estimates of *single* damages" as a benchmark. *Id.* The same logic applies here. $10,000 in statutory damages under the Wiretap Act, like antitrust treble damages, is a hypothetical "maximum potential recovery." Feldman Br. 22. But forcing district court courts to use plaintiffs' best day in court as an anchor would "undercu[t] the point of a negotiated resolution where defendants do not admit liability." *Rodriguez*, 563 F.3d at 964; *see also, e.g.*, *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (the "very essence of a settlement" is "'a yielding of absolutes and an abandoning of highest hopes'").

In short, Feldman and Jan rely on a legal framework that this Court has correctly rejected twice over. Their core premises—that the district court was required to "translate [its] intuitions" into mathematical equations and was "bound to use" maximum damage

34

awards "when beginning its evaluation," Feldman Br. 21, 23—are contrary to Circuit law, which this Court has no reason to revisit.

### 3. A $1.2 trillion benchmark would be unreasonable and unconstitutional in any event.

The objectors calculate a $1.2 trillion award of Wiretap Act statutory damages as the "maximum potential recovery," and insist that it is the only benchmark the district court should have used to judge the settlement. Feldman Br. 22. But there is no reason to think any court would have ever awarded an amount that big, not least because it would be a violation of due process.

The objectors incorrectly assume that plaintiffs' success on the Wiretap Act claim would have resulted in a $1.2 trillion payout. Feldman Br. 14. The Wiretap Act provides that district courts "may"—not must— award statutory damages, 18 U.S.C. § 2520(c)(2), and courts sometimes decline to award *any* damages under the statute, *e.g.*, *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 818–19 (11th Cir. 2004). Courts have also held that the Wiretap Act authorizes courts to award *all* available damages or *none*—and not some arbitrary figure that "falls between" those two poles. *Dish Network LLC v. Gonzalez*, 2013 WL 2991040, at *5–6 (E.D. Cal. June 14, 2013) (collecting cases). It is far from certain, then, the district

court here would have awarded *any* of these "discretionary" damages even if plaintiffs had prevailed.  FER-17.

And where statutory damages are only a possibility, district courts need not measure a settlement award against full relief.  *Lane*, 696 F.3d 811.  In *Lane*, objectors challenged a settlement as "too low in light of the possibility of" $2,500 statutory damages.  *Id.* at 823–24.  But the plaintiffs' entitlement to those statutory damages was "speculative and contingent": questions of fact surround "[e]ven . . . statutory damages," and the plaintiffs' statutory claims involved "novel legal theories."  *Id.* at 823.  Against the backdrop of that uncertainty, the $9.5 million settlement approved by the district court in *Lane* was "substantial."  *Id.* at 824; *see also Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123–24 (9th Cir. 2020) (affirming settlement where plaintiffs needed to clear "many doctrinal hurdles" to recover).  Here, similarly, plaintiffs' Wiretap Act claims involve "novel and uncertain damage theories."  FER-9.

In addition, the district court could not have awarded anything close to $1.2 trillion in statutory damages without violating due process.  Feldman and Jan argue (at 15–16) that the Wiretap Act's statutory damages are compensatory and therefore not subject to the due-process

limitations that accompany punitive damages. But whether Wiretap Act statutory damages are compensatory or punitive misses the point: This Court has held that "aggregated statutory damages awards" are *also* "subject to constitutional due process limitations." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1121 (9th Cir. 2022).[2] Those limitations protect against aggregate statutory damages that "resul[t] in extraordinarily large awards wholly disproportionate to the goals of the statute." *Id.* at 1122. Wherever that bar is, $1.2 trillion plainly surpasses it. A judgment that big would annihilate any company, including Meta, whose last reported annual net income was $23 billion. *See* Form 10-K at 55 (Feb. 1, 2023), https://tinyurl.com/49363p6y. Even Feldman and Jan agreed that $1.2 trillion in "statutory damages" would be "so great that a judgment" in that amount "would violate due process." SER-6.

---

[2] Feldman and Jan (at 15) fault the district court for not citing *Wakefield* and instead citing a case about due-process limits on punitive damages. *See* FER-15 (citing *State Farm Mut. Auto Ins. v. Campbell*, 538 U.S. 408 (2003)). But the district court correctly recognized the underlying principle that due process imposes limitations here, and at the final approval hearing, the parties discussed this Court's *Wakefield* decision, which issued the week before that hearing. FER-55–56, FER-87. The point stands: the objectors' $1.2 trillion benchmark raises due-process problems under any legal standard.

Given these due-process concerns, the district court reasonably declined to measure the settlement award against an unconstitutional yardstick. This Court has previously endorsed that approach. In *Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016), for example, the district court approved a class settlement that "awarded $15 to each claiming class member, notwithstanding the possibility of a $750 statutory penalty"—and this Court affirmed, reasoning in part that "an award of $750 per claiming class member could implicate due process concerns." *Id.* at 597. Here, too, Feldman, Jan, and the district court were all in agreement that awarding $10,000 per claiming class member would raise the same concerns. The district court sensibly measured the settlement against a realistic and constitutional potential recovery, rather than the maximum theoretical and unconstitutional recovery.

    **4.    The objectors' attempts to downplay $90 million and disregard meaningful injunctive relief are meritless.**

In addition to their attempts to shift the law, the objectors also mount factual challenges, painting the monetary and equitable relief as "pathetically inadequate." Isaacson Br. 76; *accord* Feldman Br. 1. Not so. It "is the complete package taken as a whole . . . that must be

examined for overall fairness," "rather than the individual component parts." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982). Whether viewed separately or collectively, the settlement relief here is fair.

The $90 million settlement award is one of the largest settlements in a data privacy case ever, and was the seventh-largest at the time the parties agreed to it. FER-9; *see* SER-101 (collecting settlements). As the district court reasoned, the $39 per-member return here is "significant" in the class action context. FER-136; *compare Fraley*, 638 F. App'x at 597 (approving settlement that awarded "$15 to each" class member).

Larger settlements in other cases, Feldman Br. 24–25, involved distinct claims, distinct conduct, and distinct procedural postures. In one, the case was literally weeks away from trial: before the settlement was reached, all discovery was completed; the court had denied summary judgment and certified the class; and this Court had affirmed class certification on Rule 23(f) review. *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 621 (N.D. Cal. 2021). Another settlement the objectors cite has yet to be approved, but the case completely cleared the motion-to-dismiss stage and involved the production of six million

documents. *See In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) (denying motion to dismiss); Mot. to Certify Settlement at 7, No. 18-MD-2853 (N.D. Cal. Dec. 22, 2022) (ECF No. 7). And neither case (unlike this one) involved inadvertent collection of data due to a "glitch in the system." FER-129. District courts are required to account for these differences in the "stage of the proceedings" and the "likely duration of further litigation." *Hanlon*, 150 F.3d at 1026. They are *not* required to, nor should they, simply assume that every settlement must top all the ones that came before it.

Beyond the monetary component, moreover, this settlement offers injunctive relief with significant "value to absent class members." *Campbell*, 951 F.3d at 1123, 1126–27 (holding that injunctive relief supported settlement approval); *see* FER-135 (district court explaining that injunctive relief "augments and otherwise supports" the settlement). Meta committed to "sequester and delete" all the data for all class members for the relevant time period. FER-6. That commitment was meaningful because the class representatives believed (and pleaded adequately) that they suffered harm from the collection of data that will now be deleted. *See Facebook*, 956 F.3d at 603. And that commitment to

40

sequester and delete the relevant data benefits "everybody" in the class, including those who did not submit claims or who opted out. FER-53.

Isaacson downplays the injunction's benefits, asserting that Meta "would have" sequestered and deleted the data a decade ago but for a litigation hold. Isaacson Br. 75–76. Yet there is value in a promise backed by a court order. "Whether or not" Meta "intended" to delete the data, the district court reasoned, "we don't know what would happen" without the injunction. FER-133–34. By contrast, a court order "that the data [must] be completely expunged" guarantees deletion. FER-18.

Moreover, this Court has affirmed that a cash settlement for "only a fraction of the potential recovery" does not render the settlement unfair—"particularly" where, as here, monetary relief "is but one form of the relief requested by the plaintiffs." *Officers for Justice*, 688 F.2d at 628. Throughout the "lengthy history" of *Officers for Justice*, plaintiffs sought back pay *and* injunctive relief to "halt" discriminatory practices. *Id.* And throughout this case's 10-year odyssey, plaintiffs sought monetary damages, but they also believed it was "important" to secure injunctive relief ensuring that Meta would "delete data" that "shouldn't have been collected in the first place." FER-76–77. If the injunctive relief

really were meaningless, *see* Isaacson Br. 76, the parties would not have spent "six months" negotiating the "scope and nature of that injunctive relief," FER-54; *see also* FER-133–34 (district court noting that it had "never seen a case" with an agreement to "destroy" data and finding that injunctive relief was "hard fought").

For all these reasons, the district court did not abuse its discretion in overruling the objections to the settlement's relief.

## C. The settlement's division of monetary relief is reasonable and not a basis for reversal.

Isaacson also challenges the allocation of settlement funds to plaintiffs' counsel (who received attorneys' fees) and to the plaintiffs (who received "service awards" between $3,000 and $5,000). Isaacson Br. 65–74. Meta takes no position on the former challenge. The latter challenge finds no hold in the decisions of this Court, which has repeatedly affirmed service awards up to $5,000. But most importantly, the settlement should be approved regardless of whether the Court finds the attorneys' fees or service awards are appropriate. *E.g.*, *Rodriguez*, 563 F.3d at 969 (affirming "approval of the settlement" while reversing and remanding on attorneys' fees award).

**1.** Plaintiffs' counsel sought and received approval for $26 million in attorneys' fees, or 29 percent of the settlement fund. FER-20–22. As it did below, FER-111–12, Meta takes no position on Isaacson's challenge (at 66–71) to the amount of attorneys' fees awarded.

This Court should "affirm approval of the settlement" regardless of whether the Court concludes that it should "remand the award of attorney's fees." *Rodriguez*, 563 F.3d at 969. Approval of plaintiffs' counsel's request for attorneys' fees was "not a condition of" the settlement agreement. 2-IER-181 (§ 10.4); *see also* 2-IER-164 (§ 3.6). Because the "settlement agreement in this case specifically separated the approval of fees from the rest of the settlement," the district court's "approval of the settlement can otherwise stand" even if this Court were to remand the attorneys' fees award. *Russell v. Kohl's Dep't Stores, Inc.*, 755 F. App'x 605, 609 (9th Cir. 2018).

Moreover, the objectors and the class would not be prejudiced if this Court affirmed the settlement but remanded for further proceedings on fees. The district court awarded an "upward" adjustment of attorneys' fees from the 25 percent benchmark to 29 percent of the settlement fund. FER-21. Any fees awarded to plaintiffs' counsel on remand would

43

necessarily be less than what the district court awarded, *see* FER-109, and the class would receive that difference. Accordingly, the Court should affirm the settlement regardless of whether it approves the award of attorneys' fees. *See Rodriguez*, 563 F.3d at 969.

**2.** Nor should a dispute over the district court's approval of service awards—which amounted to $29,000 in toto—upend the $90 million settlement. As with attorneys' fees, the settlement was not conditioned on the district court's approval of the service awards, 2-IER-164 (§ 3.6), so this Court should affirm the district court's order granting final approval of the settlement regardless of the service awards' propriety, *see In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1257 (11th Cir. 2021) (affirming settlement approval while vacating incentive awards); *Chieftain Royalty Co. v. Enervest Energy Inst. Fund*, 888 F.3d 455, 470 (10th Cir. 2017) (same).

Isaacson's argument cannot be squared with this Court's law on service awards in any event. *See, e.g.*, *Apple*, 50 F.4th at 785 & n.13 (rejecting broad attack on service awards and noting *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244, 1255 (11th Cir. 2020)); *Rodriguez*, 563 F.3d at 958 (explaining that service awards are "fairly typical in class action

44

cases"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (approving $5,000 awards to nine class representatives as "reasonable").

### D. The settlement notice satisfied due process.

The objectors do not dispute that the settlement administrator executed a robust notice plan by email, targeted advertisements, and social media posts that notified hundreds of millions of people about the settlement agreement. *See* FER-10–11. Feldman and Jan instead challenge the content of the notice provided to class members, faulting it for not explicitly saying that plaintiffs were settling a "Wiretap Act" claim (and other claims). This argument is both waived and groundless.

To start, Feldman and Jan forfeited this challenge. They told the district court that class members received "inadequate notice" of the settlement, but for a different reason than they now assert. SER-16. In their briefs to this Court, they claim there was a substantive error—that the settlement notice needed to describe "the actual causes of action being pursued." Feldman Br. 32. But in the district court, they asserted only a procedural error—that the notice did not reach as many people as it should have because the settlement administrator "failed to use

45

Facebook Messenger" to distribute the notices. SER-16. Parties forfeit issues when they do not raise them in the district court. *E.g.*, *Ford v. Saul*, 950 F.3d 1141, 1158 n.12 (9th Cir. 2020). And this Court (and others) consistently hold that objectors to class-action settlements may not present new arguments about the adequacy of notice or due process for the first time on appeal. *E.g.*, *In re NVIDIA GPU Litig.*, 539 F. App'x 822, 825 (9th Cir. 2013); *Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1325 (11th Cir. 2013); *In re Valdez*, 289 F. App'x 204, 206 (9th Cir. 2008). The Court should reach the same conclusion here.

The objectors' new argument is meritless in any event. Under Rule 23, "[n]otice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Rodriguez*, 563 F.3d at 962. The notice here does just that. It generally describes, in plain English, that the parties are settling a lawsuit that "alleges that [Facebook] improperly obtained and collected data from Facebook Users in the United States who visited non-Facebook websites that displayed the Facebook Like button between April 22, 2010 and September 26, 2011." FER-146. That information would "alert" potentially affected

Facebook users "to investigate" the settlement further. *Rodriguez*, 563 F.3d at 962.

Feldman and Jan contend that the settlement notice was unconstitutionally inadequate because it did not describe "the actual causes of action being pursued"—that is, the notice did not say plaintiffs had brought "a claim under the Wiretap Act." Feldman Br. 32, 35. This argument is factually true, but legally flawed: Feldman and Jan's argument "seek[s] to impose a higher standard than is required." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 567 (9th Cir. 2019) (en banc). The class notice should "describe the action and the plaintiffs' rights in it," *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985), but that "standard does not require detailed analysis of the statutes or causes of action forming the basis for the plaintiff class's claims," *Lane*, 696 F.3d at 826.

Feldman and Jan argue *Lane* does "not change the obligation," purportedly imposed by *Phillips* three decades ago, to list the claims by name in the notice. Feldman Br. 31 n.25. But that was never required, and it is they who are asking for a change in the law. Before *Phillips*, courts rejected the argument that class notice must include "all the

various causes of actions . . . alleged in the complaints." *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 799 (10th Cir. 1970). And after *Phillips*, as now-Circuit Judge Koh explained, courts "regularly approve notices that do not identify the specific causes of action" so long as they "describ[e] the conduct at issue in the litigation." *Perkins v. LinkedIn Corp.*, 2016 WL 613255, at *8 (N.D. Cal. Feb. 16, 2016).

That approach is practical, sensible, and consistent with Rule 23. A settlement notice with a laundry list of causes of action is not notice provided "in a reasonable manner" or "in plain, easily understood language." Fed. R. Civ. P. 23(e)(1)(B), (c)(2)(B). Illustrating the point, the Federal Judicial Center—whose work this Court relies on, *see In re Volkswagen "Clean Diesel" Liab. Litig.*, 914 F.3d 623, 644 (9th Cir. 2019)—has published form class notices that mirror the class notice sent in this case. Those form notices describe the key factual allegations—for example, the "lawsuit claimed that [defendants] misled investors"— without identifying the particular statutory claims at issue. FJC, *Securities Class Action Certification and Settlement: Full Notice* at 3 (2005), tinyurl.com/yw56rphv. That plain-language approach to "describ[ing] the action" makes sense. *Phillips*, 472 U.S. at 812. To avoid

48

"reader burnout," notices should "avoid details that only lawyers care about." FJC, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* at 5 (2010), tinyurl.com/59rmjfhn.

The settlement notice also gave enough information to any class members who may have been interested in learning the specific claims asserted in this case, including the Wiretap Act claim. The notice prominently linked to the settlement's dedicated website. FER-144–45, FER-147; SER-35 ("www.FBInternetTrackingSettlement.com"). And the website posted plaintiffs' second amended complaint (which alleged the Wiretap Act claim, 3-IER-511–13) and third amended complaint (which preserved the Wiretap Act claim for appeal, 3-IER-321). *See* SER-31. If class members had trouble understanding the complaints, *see* Feldman Br. 34, other filings posted to the website, such as the motion for preliminary approval, also discussed the Wiretap Act. FER-127; SER-122, SER-124 & n.3. Notices lacking the exact information objectors desire are not inadequate where "class members could easily acquire more detailed information"—whether through a "telephone number" or, here, through a website. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999) (collecting cases); *see also NVIDIA*, 539 F. App'x at 825

49

(holding class notice adequate in part because settlement website "linked" to "entire" court documents).

Ultimately, Feldman and Jan's argument about supposedly inadequate notice makes no sense. They contend that the settlement notice should have mentioned the Wiretap Act to give class members "critical information" necessary to decide whether to "opt out and sue on their own for the $10,000." Feldman Br. 35. But if the notice had contained a passing reference to the Wiretap Act, class members—who are "not themselves lawyers," Fed. R. Civ. P. 23 advisory committee's note to 2003 amendment—would not have known a purported $10,000 statutory damages payout was at stake. To convey *that* information, the class notice would have needed to discuss the Wiretap Act's multi-faceted damages scheme and the nuances surrounding statutory damages. *See supra*, at 35–38; Feldman Br. 11–12. Not even Feldman and Jan argue that much information is required in the settlement notice—perhaps because this Court has confirmed that class notices need not contain "an estimate of the potential value of [the class's] claims." *Online DVD*, 779 F.3d at 946. Their argument, then, is just empty formalism—an

insistence on an incantation that would have been at best meaningless, and at worst confusing, to class members.

In sum, the class notice provided "simple and straightforward information about the class action" that prompted class members to learn more about the case. *Online DVD*, 779 F.3d at 946. That is enough.

### E. The partial sealing of plaintiffs' complaint does not justify reversal.

Almost a decade ago, the parties litigated whether it was necessary to seal parts of plaintiffs' second amended complaint. Facebook explained that sealing was necessary because the complaint contained "non-public, confidential, proprietary Facebook business information" that might be used by competitors against the company, including information about "Facebook's internal discussions regarding [its] use of cookies." 3-IER-463. The district court ordered the requested sealing. SER-150; *accord* 1-IER-34 (ordering partial sealing of third amended complaint).

Isaacson now wants to reopen that issue, insisting that limited redactions in a complaint render class representatives inadequate and make it impossible for absent class members to evaluate a settlement. Isaacson Br. 55–61. But he cites no cases holding as much. Nor does he

identify what sort of information plaintiffs and the absent class members might be missing.

Isaacson suggests that partially sealed complaints are per se violations of the right of public access to court proceedings. Isaacson Br. 53–54, 57–61. But that has never been the law. The right of public access "is not absolute." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978). Various interests can outweigh that right, including protecting from public view "sources of business information that might harm a litigant's competitive standing." *Id.* That general rule—a presumption of openness that can yield to overriding private interests—also applies to complaints. So long as the district court does not abuse its discretion in applying the sealing standard, the partial sealing of a complaint is appropriate. *E.g.*, *Philibotte v. Nisource Corp. Servs. Co.*, 793 F.3d 159, 162 n.2 (1st Cir. 2015); *IDT Corp. v. eBay*, 709 F.3d 1220 (8th Cir. 2013).

Unsurprisingly, then, Isaacson does not cite a single case showing that courts may not approve class-action settlements where some documents, including complaints, are partially sealed. The cases he does cite stand for different, uncontroversial propositions that this case does not test:

52

- Isaacson cites one case holding that it's inappropriate for courts to seal an *entire* complaint, Isaacson Br. 57 (citing *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132 (2d Cir. 2016)), and a few others, all brought by Courthouse News, holding that court clerks must promptly make filed complaints available to the public, Isaacson Br. 57–58. Here, Facebook sought to seal only a small fraction of plaintiffs' complaints. No delays, whether created by the parties or any court, have ever deprived the public of access to those complaints.

- Isaacson cites a case holding that the defendant's identity was not a trade secret justifying sealing throughout a complaint. Isaacson Br. 57–58 (citing *Depuy Synthes Prods., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364 (Fed. Cir. 2021)). Here, Meta never sought to keep such basic information out of the public eye.

- Isaacson also cites a couple of cases for the proposition that a named plaintiff, to be an adequate class representative, must know enough to control the case. Isaacson Br. 55. But knowing enough is not the same as knowing *everything*. Courts have

consistently held that plaintiffs are not inadequate class representatives even if they know very little about their cases. *E.g.*, *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 370–74 (1966); *In re Suboxone (Buprenorphine Hydrochlorine and Naloxone) Antitrust Litig.*, 967 F.3d 264, 272 (3d Cir. 2020); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 430 (4th Cir. 2003); *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 61 (2d Cir. 2000).

- Finally, Isaacson cites *Shane Group, Inc. v. Blue Cross Blue Shield*, 825 F.3d 299 (6th Cir. 2016). Isaacson Br. 59. There, the Sixth Circuit vacated a settlement-approval order in part because the district court had abused its discretion in ordering the sealing of case records. But the facts in that case were extreme: The district court had ordered the operative complaint, the plaintiffs' class-certification motion, the defendant's *Daubert* motion, and almost 200 exhibits sealed—leaving "both the general public and the class" with "only fragmentary information about the conduct giving rise to this litigation, and next to nothing about the bases of the settlement itself." 825 F.3d at

306. The redactions here, by contrast, are modest, and Isaacson has never identified anything that plaintiffs and the rest of the class cannot understand because of them.

Isaacson is wrong not just on the law, but also on the facts. He repeatedly says that plaintiffs' complaints were so heavily redacted that plaintiffs themselves and other class members could not understand the case enough to make informed decisions about settlement. Isaacson Br. 54–56, 59. That is simply false. The second amended complaint, for example, is 57 pages long. 3-IER-469–530. Only 13 of those pages contain any redactions at all, and on six of those pages the redactions are limited to no more than a few words. Essentially the entire complaint is available for public consumption—the entire introduction (apart from a couple of redacted words), dozens of pages of unredacted factual allegations, and the entire section asserting plaintiffs' claims and prayer for relief. The complaint tells a complete and intelligible story, making clear the nature of the claims, their factual basis, and plaintiffs' theory of damages. Presumably that is why Isaacson never explains what plaintiffs and the absent class members could possibly be missing.

Instead, Isaacson repeatedly notes that in opposing sealing below in 2015, plaintiffs' counsel said that they could not "fully inform the named plaintiffs of the full basis for their claims."  Isaacson Br. 54–55. But plaintiffs' counsel not only declined to renew that argument in the last appeal, they also have never said that plaintiffs lack the information to understand the case well enough to direct it.  Ultimately, Isaacson's position is that courts may not certify classes or approve class-action settlements when *any* portion of a complaint, no matter how small, is sealed.  No authority supports that extreme position.

Finally, Isaacson says that even if the district court's sealing decisions were right when they were made, they're wrong now because the information that was sealed is now stale.  Isaacson Br. 60–61.  This is another argument that proves too much and that could be made in any settlement-approval appeal litigated years after the filing of a complaint.

In short, Isaacson has given the Court no good reason to revisit the sealing issue.  Plaintiffs and the absent class members had more than enough information to understand the case, and they overwhelmingly approved the settlement.

## CONCLUSION

This Court should affirm the district court's approval of the settlement.

Dated: July 20, 2023

Respectfully submitted,

*/s/ Lauren R. Goldman*
Lauren R. Goldman

*Counsel for Meta Platforms, Inc.*

57

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Meta Platforms, Inc. states that it is not aware of any related cases pending before this Court.

Dated: July 20, 2023           /s/ *Lauren R. Goldman*
                              Lauren R. Goldman

                              *Counsel for Meta Platforms, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that under Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-1(a), this answering brief is proportionately spaced, has a typeface of 14 points, and contains 10,891 words, excluding the portions excepted by Federal Rule of Appellate Procedure 32(f).

Dated: July 20, 2023  /s/ *Lauren R. Goldman*
  Lauren R. Goldman

  *Counsel for Meta Platforms, Inc.*